UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

MANCHESTER MANAGEMENT COMPANY,
LLC, MANCHESTER ALPHA, L.P., JEB
PARTNERS, L.P., in its individual and
derivative capacity, JAMES E. BESSER,
and DONALD E. BESSER,

                        Plaintiffs,

                  v.

ECHO THERAPEUTICS, INC., MICHAEL
GOLDBERG, SHEPARD GOLDBERG,
ALEC GOLDBERG, PLATINUM
MANAGEMENT (NY) LLC, MARK
NORDLICHT, BERNARD FUCHS, and
MEDICAL TECHNOLOGIES INNOVATION
ASIA, LTD.,

                      Defendants,

ECHO THERAPEUTICS, INC.,

                Nominal Defendant.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 14, 2018

16 Civ. 9217 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

    On November 29, 2016, Plaintiffs Manchester Management Company, LLC, Manchester Alpha, L.P., JEB Partners, L.P., James E. Besser, and Donald Besser (collectively, "Plaintiffs") filed a complaint in this District along with an *ex parte* application for a temporary restraining order ("TRO"). In their complaint, Plaintiffs claimed that they had been misled in their purchase of securities in Echo Therapeutics, Inc. ("Echo"); they laid blame for that deception at the feet of three individuals associated with Echo — cousins

Michael and Shepard Goldberg and Michael's son Alec (together with Echo, the "Echo Defendants") — as well as the hedge fund Platinum Management (NY) LLC ("Platinum Management"), its co-owners Mark Nordlicht and Bernard Fuchs (with Platinum Management, the "Platinum Defendants"), and a Chinese company, Medical Technologies Innovation Asia, Ltd. ("MTIA") (with the Echo and Platinum Defendants, "Defendants"). In their request for injunctive relief, Plaintiffs claimed that a contemplated transaction between Echo and MTIA that was scheduled to close imminently would result in the improper expropriation to China of Echo's intellectual property.

The Court granted the application for a TRO and, after expedited discovery, convened a two-day-long hearing (the "Hearing") on Plaintiffs' motion for a preliminary injunction on December 8 and 9, 2016. After concluding, on the concededly incomplete record before it, that Plaintiffs had not met their burden of demonstrating irreparable harm or a likelihood of success on the merits, the Court denied Plaintiffs' motion. Ten days later, before Defendants responded to the complaint, Plaintiffs voluntarily dismissed their lawsuit pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

The Echo Defendants contend that Plaintiffs' lawsuit was a precipitous — indeed, vexatious — action, whose ruinous consequences cannot be remedied merely by its dismissal. In consequence, the Echo Defendants seek sanctions under the mandatory review provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(c)(1), Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power. The Court

2

understands Echo's frustrations, but cannot find on this record that the lawsuit was either frivolous or vexatious. Accordingly, and as detailed in the remainder of this Opinion, the Court denies the Echo Defendants' motion.

**BACKGROUND**[1]

## A. Factual Background

Because this motion focuses on Plaintiffs' conduct in this litigation, the Court will address only briefly the parties' interactions before November 29, 2016. Echo is a medical device company that focuses on non-invasive continuous glucose monitoring ("CGM") and associated technologies. (Compl. ¶ 1). In or about December 2013, Echo entered into a License, Development and Commercialization Agreement (the "Licensing Agreement") with MTIA, pursuant to which Echo granted MTIA rights to develop, manufacture, market and distribute Echo's CGM system in China. (*Id.* at ¶ 19).[2] To a degree disputed vigorously by the parties, the Licensing Agreement permitted transfer

---

[1] The facts in this section are drawn from Plaintiffs' complaint ("Complaint" or "Compl." (Dkt. #1)); the affidavits and declarations submitted in connection with this litigation (cited using the conventions "[Name] PI Decl." and "[Name] Sanctions Decl."); and the transcripts of the hearing on Plaintiffs' motion for a preliminary injunction (cited using the convention "Tr." (Dkt. #44, 48)). For ease of reference, the Echo Defendants' supporting memorandum is referred to as "Def. Br." (Dkt. #59); Plaintiffs' opposition memorandum as "Pl. Opp." (Dkt. #61); and the Echo Defendants' reply memorandum as "Def. Reply" (Dkt. #63).

[2] The parties dispute whether the Licensing Agreement was extant in 2016. (*Compare* Pl. Opp. 4-5, *with* Def. Reply 4-5; *see also* Tr. 6 ("That is because the licensing amendment filed with the [Form 8-K] on or about November 23, we have found out is, in fact, based upon a licensing agreement that was terminated by Echo in or about September 2014.")). Plaintiffs argue that MTIA had failed to make a required payment; Defendants rejoin that Echo's Board of Directors had waived the requirement, though no written memorialization of this waiver was produced during the Hearing.

3

of certain of Echo's intellectual property to MTIA, though Echo retained ownership over such property. (*Id.*).

Also in December 2013, Echo and several Platinum-related entities entered into a Securities Purchase Agreement (the "SPA") for the purchase of more than 1.8 million shares of Echo stock. (Compl. ¶ 21). Platinum obtained a seat on Echo's Board of Directors, and nominated Dr. Michael Goldberg, who later became Board Chairman in February 2015. (*Id.* at ¶ 24 n.7). Michael's cousin Shepard Goldberg was elected to the Board in June 2014 after a contentious proxy fight. (*Id.* at ¶ 25).[3] In September and December of 2014, various Platinum-related entities infused cash into Echo. (*Id.* at ¶¶ 27-28, 31).

In January 2016, NASDAQ initiated procedures to delist Echo; stated reasons included the failure to meet stockholders' equity requirements and the failure to hold an annual stockholders' meeting. (Compl. ¶ 43). In that month, and then again in May 2016, Plaintiffs purchased a total of $800,000 of Echo's 10% senior secured convertible notes (the "Notes") through a Confidential Private Placement Memorandum (the "PPM"). (*Id.* at ¶¶ 3, 11-13). As a result

---

[3]    According to the Complaint, Alec Goldberg was hired as Manager of Business Development for Echo in June 2014. (Compl. ¶ 29). The younger Goldberg's name came up during the preliminary injunction hearing, though he was not called as a witness by either side. (*See* Tr. 235-37, 250-51). But in recounting that fact, the Court does not adopt the Echo Defendants' conclusion that the naming of Alec Goldberg as a Defendant is evidence of the bad faith of Plaintiffs' lawsuit. (*See, e.g.*, Def. Br. 2 n.3). As just noted, Alec Goldberg was employed during the relevant time period as Manager of Business Development at Echo, and he was involved with Michael Goldberg in reviewing financing offers submitted by Bai Ge of MTIA. (Tr. 235-36). That Alec Goldberg was not called as a witness demonstrates to this Court only that he was not deemed probative by either side of the issue of Plaintiffs' claimed need for preliminary injunctive relief — not that he was an improper party to the lawsuit.

of their purchases, Plaintiffs obtained "a security interest in the assets of Echo, including, but not limited to, Echo's intellectual property." (*Id.* at ¶ 12).

Plaintiffs observe that various Platinum-related entities were subject to civil and criminal investigations and/or litigation in 2016. (*See, e.g.*, Compl. ¶¶ 6-10, 45-46). This turmoil, it is alleged, then spread to Echo: "Since in or about July 2016 to date, Echo has been in a state of constant and acute financial distress." (*Id.* at 48). Echo's alleged reactions to this distress resulted in Plaintiffs' lawsuit.

## B. Procedural Background

### 1. The Complaint and the TRO

Plaintiffs filed the Complaint on November 29, 2016. The key factual assertions were as follows:

> As set forth herein, the Platinum Defendants, Echo, Michael Goldberg ("M. Goldberg") and Shepard Goldberg ("S. Goldberg") made material misrepresentations and/or omissions in connection with Echo's offer and sale of $6,000,000 of 10% senior secured convertible notes (the "Notes"), of which Plaintiffs purchased $800,000. These misrepresentations and/or omissions occurred through the means of a Confidential Private Placement Memorandum ("PPM"). In the PPM, Defendants intentionally and carefully concealed that Echo's business and board of directors were under the direct and absolute control of the Platinum Defendants in violation of Federal Securities Laws. Through the Platinum Defendants' undisclosed dominion over Echo, the Defendants have and continue to plunder Echo's trade secrets, including its state-of-the-art CGM technology in violation of the Economic Espionage Act of 1996 (as amended by the Defend Trade Secrets Act of 2016).
>
> ***

The Goldberg Defendants, in their positions of control over Echo's board of directors, have ensured that the Platinum Defendants' instructions to plunder the assets of Echo were carried out. To this day, the Platinum Defendants, both directly and through the Goldberg Defendants, are proceeding to plunder Echo's trade secrets by providing them to Defendant Medical Technologies Innovation Asia, Ltd. ("MTIA"), which has substantial ties to the Platinum Defendants and the Goldberg Defendants, the full extent of which is not yet known.

(Compl. ¶¶ 3, 5). The Complaint alleged ten causes of action, including, as relevant here, claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (*Id.* at ¶¶ 116-27).

Concurrent with the Complaint, Plaintiffs filed an application for a temporary restraining order.[4] The TRO application focused in particular on the possibility that Echo CGM technology — in which Plaintiffs, by dint of their investment, had an interest — was being improperly transferred out of Echo's control and into MTIA's for little or no consideration. In support of the application, Plaintiffs included a sworn statement from Thomas Bishop, who had only a few days earlier left Echo as its Vice President of Operations and Product Development. (Bishop PI Decl.). Bishop began his affidavit with a primer on Echo and its CGM technology, including his estimate that "[s]ince

---

[4] The Court finds it curious that the Echo Defendants continue to make much of the *ex parte* nature of the TRO application, because the Court understood this issue to have been resolved at the Hearing. Counsel for Plaintiffs told the Court at the time of the TRO, and contemporaneous documents confirm, that Echo's counsel had specifically disclaimed representation of the company or its representatives in the litigation at the time of its filing. (*See* Whelan Sanctions Decl., Ex. D).

2007, ... Echo has invested, at least, one hundred million dollars ($100,000,000) in CGM technology." (*Id.* at ¶ 3). He then recounted a lengthy history of his interactions with representatives of both Platinum-related entities and MTIA; Bishop contended that Echo had striven *not* to provide certain source code and algorithms to MTIA, reasoning that such material was outside of the scope of the Licensing Agreement, but that certain individuals had provided such information, and contemplated providing additional information, to MTIA for no additional compensation. (*See, e.g., id.* at ¶¶ 12-21, 30; *see also id.* at ¶ 37 ("It is my belief that the Licensing Agreement is a mechanism by which Platinum Partners, the Goldberg Defendants and MTIA are attempting to transfer, for little to no cost to MTIA, Echo's intellectual property that was developed at a cost of over $100,000,000. The Licensing Agreement did not provide MTIA with the right to take full access to Echo's intellectual property[.]")). Bishop coupled his IP concerns (which, he claims, were shared throughout Echo's R&D team) with concerns that "Platinum Partners, through M. Goldberg's long association with the company, may have controlled Echo." (*Id.* at ¶ 23[5]; *see also id.* at ¶ 30 (noting that severance package for outgoing Echo CEO Scott Hollander "upset everyone in Echo's R&D team ... because it appeared that Hollander agreed to transfer [Echo intellectual property] to MTIA for consideration of the Goldbergs agreeing to pay Hollander $420,000 in severance")).

---

[5]    Platinum Partners Value Arbitrage Fund L.P. was alleged to be the "flagship hedge fund for Platinum [Management.]" (Compl. ¶ 2).

Plaintiff James Besser built on these twin concerns in his own supporting affidavit. (Besser PI Decl.). After recounting Plaintiffs' investments in Echo, Besser catalogued several putative misstatements and material omissions that, he claimed, made clear that "Platinum had and exercised complete control and domination over Echo." (*Id.* at ¶ 10; *see also id.* at ¶ 64 ("Plaintiff[s] would never have purchased the Notes and agreed to Platinum being the Collateral Agent had Plaintiffs known that Platinum (and its officers) were the undisclosed principals of Echo or had Plaintiffs known the material and ongoing connections between M. Goldberg and Platinum, none of which were disclosed in the PPM")). Besser also described financing offers that Plaintiffs had made to Echo that, as Besser explained, were "far superior to that offered by MTIA." (*Id.* at ¶ 24; *see also id.* at ¶ 46 (noting "no legitimate business purpose" in threat to "shutter" Echo rather than accept financing from Plaintiffs)). These dealings caused Besser to conclude that "purloining Echo's intellectual property rights out from under Echo and to MTIA is the goal behind Platinum, M. Goldberg, S. Goldberg, and MTIA's conduct." (*Id.* at ¶ 24)). Finally, Besser explained the need for emergent relief: After appearing to settle its disputes with Plaintiffs in October 2016, Echo unexpectedly changed course without giving the contractually-required notice and entered into an amendment with MTIA to the Licensing Agreement — one that Plaintiffs believed violated the terms of the Notes. (*Id.* at ¶¶ 58-63).

The Court issued a TRO that same day, and set a hearing on Plaintiffs' preliminary injunction motion for December 8, 2016. (Dkt. #3). The Court also

ordered limited discovery on an expedited basis. (*Id.*). Thereafter, Plaintiffs moved for alternate service on MTIA; the Court denied the first application without prejudice, and granted the second application on December 6, 2016, two days before the scheduled hearing. (Dkt. #4-7, 13-15, 20).

Also on December 6, the Court received opposition papers from the Echo Defendants. (Dkt. #21-22). At the end of the day, the Court held a telephonic conference with counsel for Plaintiffs and counsel for certain of the Platinum Defendants. (Dkt. #30). Counsel for Mark Nordlicht protested the late deposition notice received by his client, citing questions of fairness and undue burden. Counsel suggested that the burden was particularly acute for Nordlicht because, in the Court's parlance, he "ha[d] no horse in the TRO race," and that indifference evidenced "the degree of control or interest he ha[d] in these matters." (*Id.* at 23). Plaintiffs' counsel responded, however, that Plaintiffs had an interest in Nordlicht's testimony:

> [W]e believe Mr. Nordlicht has information and evidence that would help us establish that burden [of proving entitlement to continued injunctive relief], because frankly we believe there is a relationship, a strong relationship of him being an undisclosed principal and Platinum being an undisclosed principal, of Mr. Fuchs being an undisclosed principal, and the information we want from Mr. Nordlicht goes directly to that issue, and we think we can establish that on a preliminary injunction basis, which would support the entirety of the preliminary injunction.

(*Id.* at 24). After hearing from the parties, the Court permitted Plaintiffs two hours of deposition testimony from Nordlicht. (*Id.* at 26-28).

## 2. The Preliminary Injunction Hearing

The hearing on Plaintiffs' application for a preliminary injunction began on December 8, 2016. In attendance were counsel for, and representatives of, Plaintiffs and the Echo Defendants, and counsel for Mark Nordlicht. No representative of MTIA was present.

The Court heard brief introductory statements from the parties. (Tr. 6-9). Plaintiffs then called six witnesses, beginning with Thomas Bishop, the former Echo VP of Operations and Product Development. Bishop hewed largely to the factual assertions he had made in his affidavit, and offered interpretations of the Licensing Agreement. (*See, e.g., id.* at 14 ("So I believe that the [Licensing Agreement] gave MTIA the ability to manufacture the product and distribute the product, to use it and to further its development, but it did not include the specific intellectual property that was owned by Echo; in particular, the algorithms that were developed by Echo that allowed the signal to be effectively processed."); *see also id.* at 77-79 (discussing bases for concern that Echo would lose control over its intellectual property to MTIA)).

On cross-examination, Bishop was provided with a copy of the Licensing Agreement, and was directed to the definition of Echo "know-how" — which, in contrast to Bishop's earlier testimony, included Echo algorithms. (Tr. 51-57).[6] Bishop was also asked, among other topics, about his understanding of the

---

[6]     Bishop explained that his understanding of the Licensing Agreement was influenced by, and shared by, then-CEO Scott Hollander. (*See* Tr. 54 ("The decision not to provide the algorithms was made between myself and a discussion with Scott Hollander who was the CEO at the time who, we discussed and agreed that our interpretation, it was not included in the license agreement.")).

royalty rates for MTIA's use of Echo intellectual property. (*Id.* at 63-65). And defense counsel sought Bishop's acknowledgment that the Licensing Agreement only restricted Echo's ability to develop its intellectual property in China. (*Id.* at 67-68).

The next witness was former Echo CEO Scott Hollander. Hollander discussed his interactions with various Platinum representatives, including Bernard Fuchs and Alice Chen, and with Bai Ge of MTIA. (*See, e.g.*, Tr. 90-98). Hollander also discussed various efforts, most of which were unsuccessful, to obtain financing for Echo in 2016. (*Id.* at 103-12). Current CEO Alan Schoenbart then testified about the Licensing Agreement (in particular, its viability *vel non* in late 2016), and his dealings with MTIA and Platinum. (*See, e.g., id.* at 125-27). Schoenbart also pushed back on Plaintiffs' argument that their offer was superior to MTIA's, and opined that a principal stumbling block to Echo's ability to obtain necessary financing was Plaintiff James Besser:

> There [were] just a lot of complex issues, and the investors weren't — the investors, the main investor that wasn't agreeing to this was Mr. Besser, and we couldn't move forward with our financing. So we did the bridge in September and tried to, you know, work through the complexities until it became that the complexities weren't going to get worked out, and Mr. Besser sent a letter, like cease and desist letter, and here is my terms or something like that, or he had sent terms, and he was upset we didn't accept his terms.

(*Id.* at 141). On cross-examination, Schoenbart related that he had no concerns that MTIA would act beyond its authority under the Licensing

Agreement, or that the Platinum Defendants would misappropriate Echo's technology. (*Id.* at 165-66).[7]

Plaintiffs called both Mr. Shepard Goldberg and Dr. Michael Goldberg. Mr. Goldberg discussed, among other things, conversations with James Besser concerning the latter's "wish to participate, his wish to stop the Chinese partnership from investing." (Tr. 187). Mr. Goldberg was also shown numerous emails, including emails from Platinum representatives such as Mark Nordlicht. (*See, e.g., id.* at 197-202, 204-07). For his part, Dr. Goldberg was questioned about the PPM, including restrictions on Echo's participation in future financing. (*Id.* at 215-19). He was also questioned about his prior affiliation with, and interactions with representatives of, Platinum-related entities. (*Id.* at 219-22). Plaintiffs' counsel and Echo's counsel pressed Dr. Goldberg about the ostensible failure of MTIA to comply with its obligations under the SPA. (*Id.* at 223-30, 244-45). And Dr. Goldberg testified about the competing finance proposals presented to Echo in 2016. (*Id.* at 231-34, 236-41; *see also id.* at 251-53).

The final witness was Plaintiff James Besser. Early in his testimony, Besser discussed the due diligence he undertook preliminary to Plaintiffs' investment in Echo. Commenting on snippets of information concerning Echo that had come out in the testimony of other witnesses, Besser testified that he

---

[7] During his testimony, Schoenbart also explained how the litigation had compromised Echo's relationship with MTIA, to the point of rendering it unlikely that the $5 million financing deal would take place. (Tr. 169-72). In this setting, Schoenbart mentioned a press release issued by Plaintiffs concerning the TRO two days before the Hearing. (*Id.* at 172-75). James Besser was also questioned about the press release. (*Id.* at 283-84).

would not have invested in Echo had he known the information. (*See, e.g.,* Tr. 264 ("If, based on the descriptions that I have heard here today, if the meetings [involving Fuchs, Chen, Echo, and MTIA personnel] were related to the developmental milestones and the intimate details of the product, that's far beyond any kind of involvement that I have ever had with a company."); *see also id.* at 308 ("What I'm objecting to is a pattern of heavy investment in the day-to-day operation and research activities of the company by affiliates of a significant investor who appeared to only own 9.9 percent of the voting stock of the company.")). Besser also recounted his discussions with Echo representatives concerning Plaintiffs' financing proposals in 2016 (*e.g., id.* at 269-75), and the events that led to the filing of the Complaint (*e.g., id.* at 276-82). On cross-examination, among other things, Besser acknowledged that he had not read, or had not read with care, certain Echo documents. (*Id.* at 284-89, 297-98, 300-01).

### 3. The Court's Decision

The next day, December 9, 2016, the Court conducted oral argument on Plaintiffs' motion. During the Court's questioning, Plaintiffs' counsel commented on the absence of evidence regarding the Platinum Defendants and MTIA, and went so far as to request an adverse inference from the Court:

> Your Honor, that would have been very helpful with respect to presenting evidence on that issue had Mr. Fuchs shown up for his deposition, produced documents pursuant to the order. Had he shown up at yesterday's hearing, it would have been helpful and if MTIA showed up or actually contacted me at all with

13

respect to producing documents or making themselves available even if it was telephonically for a deposition.

He never contacted me with respect to asking for an extension [at] any point in time. We know MTIA has access to a significant amount of funds, just to the investments they made. We know [MTIA] and Mr. Bai Ge came to the United States on multiple occasions and we know he has some proficiency in English. They never made any attempt to contact us, MTIA or Mr. Fuchs. I can assure you that would have been a central focus of this discovery and certainly my questions yesterday on that issue.

\*\*\*

With respect to Mr. Fuchs and MTIA's failure to show, I think that would have provided significant additional evidence with respect to the relationship with Platinum. That failure to show and that failure to produce documents, I believe an adverse inference can be made with respect to how Platinum controlled Echo.

(Tr. 338-39, 341).[8]

The Court heard brief closing arguments from the parties, and adjourned

for several hours before rendering an oral decision denying the motion. The

---

[8]  These sentiments were reiterated in counsel's summation:

> Your Honor, briefly, in closing, again, not to belabor the point, but we have had the prejudice of not having the ability to have a fully developed record. We don't have the ability to have a fully developed record with, I think, two of the key parties in this case that would provide a tremendous amount of clarity to the relationships between MTIA, Echo, and Platinum. It would provide a tremendous amount of clarity, particularly with Mr. Fuchs, concerning why he was advocating on Platinum's behalf for the transfer of certain technology. And it is because — and with MTIA, it would have provided a tremendous amount of clarity with respect to what happened back in 2014 and why that payment wasn't made and whether it was something that was agreed upon between MTIA and Echo that that payment would not have had to have been made, that it was some type of understanding. That would have all been very, very powerful information that — who knows what would have happened had we been able to get that information?

(Tr. 374).

Court began, appropriately, by complimenting the parties for their efforts in such a compressed time frame and by explaining its decision to credit the testimony of the various witnesses. (Tr. 380-81). It then addressed, and denied, Plaintiffs' request for an adverse inference, though it recognized the reasons why Plaintiffs' evidentiary record was incomplete. (*Id.* at 381-82).

The Court then proceeded to consider the standard for preliminary injunctive relief and found that Plaintiffs had failed to meet their burden, beginning with the requirement of irreparable harm. The Court found that, at the time they sought the TRO, Plaintiffs had misperceived that "a consummation of Amendment No. 2 would result in the expropriation of Echo's intellectual property to China with the attendant loss of control over that property and the possible shutting down of Echo's U.S. operations." (Tr. 384). The Court found, to the contrary, that witnesses on both sides were keen to preserve the long-term viability of Echo, and that "this dispute really does boil down to a very stark difference of opinion about the best way to keep Echo afloat and to get this concededly beneficial technology to market." (*Id.* at 384-85). It also found that Plaintiffs' arguments on irreparable harm proceeded from a "misunderstanding of Echo's and MTIA's financing and licensing obligations," which it then proceeded to review with the parties. (*Id.* at 386).

The Court also found that Plaintiffs had failed to prove a likelihood of success on the merits, although it clarified the scope of its holding:

> There were 10 claims for relief in the complaint, but through today's conversation, I understand that three bases in particular are being proffered for injunctive

> relief: The misappropriation claim; the securities fraud claim; and the breach of fiduciary duty claim.
>
> Let me be clear. The fact I am finding ultimately the plaintiffs have not demonstrated likelihood of success on the merits sufficient to warrant the injunctive relief they seek is not tantamount to a ruling that their complaint lacks merit.

(Tr. 387-88). With particular respect to Plaintiffs' securities fraud claims, the Court found that "[P]laintiffs have not shown a likelihood of success of their argument that the business decisions of which plaintiffs now complain are the product of anything other than the business judgment of the officers and directors of Echo, faced with some rather trying financial circumstances." (*Id.* at 394).

Reviewing the other factors, the Court found that the balance of hardships favored Defendants, citing Echo's precarious financial condition. (Tr. 396-97). Finally, the Court found that the public interest factor played "the least prominent role in my calculus." (*Id.* at 397). For all of these reasons, the Court dissolved the temporary restraining order, and left for another day the scheduling of defense responses to the Complaint. After staying enforcement of its decision to permit Plaintiffs to consider an emergency appeal to the Second Circuit, the Court entered an order in line with its oral decision on December 12, 2016. (Dkt. #29).

### 4. The Dismissal and the Motion for Sanctions

On December 15, 2016, the Echo Defendants submitted a letter requesting a pre-motion conference on their contemplated motion to dismiss.

(Dkt. #32). Counsel for Bernard Fuchs submitted a similar letter four days later. (Dkt. #34).

On December 19, 2016, Plaintiffs filed a notice of voluntary dismissal without prejudice, pursuant to Rule 41(a)(1)(A)(i). (Dkt. #36-38). Three days later, on December 22, 2016, counsel for the Echo Defendants sought a pre-motion conference with the Court to address their belief that a mandatory sanctions inquiry was warranted under the PSLRA and Rule 11. (Dkt. #39; *see also* Dkt. #40 (Plaintiffs' response)). A conference on the matter was held on January 10, 2017. (Dkt. #50 (transcript)). At that time, counsel for the Echo Defendants previewed the bases for their motion:

> I would not be making an application under Rule 11. I would be making an application under the inherent authority of the Court to review whether actions brought before it are brought in bad faith or vexatious or brought with a proper purpose; and, if not, I think the Court does have that inherent power. I also believe that the Court has the power to award sanctions under Section 1927 where an action that lacks a colorable position is asserted again for vexatious or improper purposes. So, basically, there are three prongs to the request for sanctions: the inherent power, Section 1927, and the PSLRA requirement to consider whether an action that asserts a securities law violation, whether that action was brought in accordance with the proper standard.

(*Id.* at 4-5).[9]

---

[9]     Because of the detail with which the Echo Defendants outlined their arguments in the pre-motion letter and resulting conference, the Court believes that Plaintiffs received adequate notice of the arguments being made in the motion. For this reason, the Court rejects Plaintiffs' arguments concerning violations of Local Rule 7.1(a)(1) and Federal Rule of Civil Procedure 7. (*See* Pl. Opp. 13).

The Echo Defendants filed their motion papers and supporting declarations on March 6, 2017. (Dkt. #56-59). Plaintiffs filed their opposition submissions on April 5, 2017. (Dkt. #60-62). The Echo Defendants filed a reply brief on April 19, 2017 (Dkt. #63), and a supplemental letter brief on October 11, 2017 (Dkt. #64).

## DISCUSSION

### A. The Court Will Not Impose Sanctions Under the PSLRA

#### 1. Applicable Law

##### a. Sanctions Under Rule 11 Generally

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that

> [b]y presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing."  *Bus. Guides, Inc.* v. *Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

The Second Circuit recently offered the following guidance concerning the imposition of sanctions under Rule 11:

> "A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted).  For example, Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents." *Eastway Constr. Corp.* v. *City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by rule.*

*Sorenson* v. *Wolfson*, 683 F. App'x 33, 35 (2d Cir. 2017) (summary order); *see also Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (noting that Rule 11 sanctions for pleadings are subject to an "objective unreasonableness" standard); *cf. Fishoff* v. *Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable.  The operative question is whether the argument is frivolous, i.e., the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" (internal citations omitted)).

Additional restrictions pertain in the context of sanctions imposed for improper legal (as distinguished from factual) arguments.  "Sanctions that

involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law.  Monetary responsibility for such violations is more properly placed solely on the party's attorneys." Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.  "Whether an attorney's conduct was unreasonable should be determined not with the benefit of hindsight, but rather on the basis of what was objectively reasonable to believe at the time the pleading, motion or other paper was submitted.  Furthermore, all doubts must be resolved in favor of the signer of the pleading." *In re IPO Secs. Litig.*, 399 F. Supp. 2d 369, 371 (S.D.N.Y. 2005) (citations omitted).

### b. Sanctions in Private Securities Actions

In other types of litigation, even where Rule 11 is violated, "sanctions under Rule 11 are discretionary, not mandatory." *Ipcon Collections LLC* v. *Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012).  Not so in the private securities litigation context.  Instead, the district court is obligated under the PSLRA in certain circumstances both to consider the plaintiff's submissions under Fed. R. Civ. P. 11, and to impose sanctions if violations of that rule are found:

> (1) **Mandatory review by court**:  In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

> (2) **Mandatory sanctions**:  If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure.  Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 78u-4(c)(1)-(2); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009) ("*ATSI*"); *Rombach* v. *Chang*, 355 F.3d 164, 178 (2d Cir. 2004).

"The express congressional purpose" of this provision of the PSLRA is "to increase the frequency of Rule 11 sanctions in the securities context, and thus tilt the 'balance' toward greater deterrence of frivolous securities claims." *ATSI*, 579 F.3d at 152; *accord Gurary* v. *Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 219-22 (2d Cir. 2002) ("*Gurary III*"); *Simon DeBartolo Grp., L.P.* v. *Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166-67 (2d Cir. 1999).  *See generally* 5A Charles Alan Wright *et al.*, FEDERAL PRACTICE & PROCEDURE § 1338.1 (3d ed. 2004); William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 19.28 (5th ed. 2011).

Significantly, however, "[t]he PSLRA … does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found." *Simon DeBartolo Grp.*, 186 F.3d at 167.

### c. The Presumption for Substantial Violations of Rule 11

What is more, Section 78u-4(c)(3) states a presumption concerning the appropriate fees to impose and its rebuttal:

> (3) Presumption in favor of attorneys' fees and costs
>
> (A) In general:  Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction — (i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and (ii) *for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure* is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.
>
> (B) Rebuttal evidence:  The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that — (i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or (ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.
>
> (C) Sanctions:  If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(c)(3) (emphasis added).

The term "substantial violation" is not defined in the statute.  In *Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212 (2d Cir. 2002) ("*Gurary III*"), the Second Circuit sought to delimit the term, and, in so doing, to resolve the related

issues of "whether a complaint containing both frivolous and nonfrivolous allegations triggers the statutory presumption, and, if so, whether the presence of nonfrivolous allegations, by itself, rebuts that presumption[.]" *Id.* at 219. After identifying various categories of non-frivolous claims that might appear in a private securities action,[10] the Second Circuit concluded that "once a substantial violation is found, the existence of some nonfrivolous claims does not suffice to rebut the statutory presumption on the ground that full sanctions would be an unreasonable and unjust burden." *Id.* at 222. That led the Court naturally to define what constituted a "substantial violation" in the pleading context:

> [A] substantial violation occurs whenever the nonfrivolous claims that are joined with frivolous ones are insufficiently meritorious to save the complaint as a whole from being abusive. Under this interpretation, the district court must examine the qualitative substance of the nonfrivolous claims in order to assess whether these claims were, in fact, legitimate filings that had the potential of prevailing or whether they patently lacked merit and only narrowly avoided being deemed frivolous themselves.

*Gurary III*, 303 F.3d at 222. The Court confirmed, however, that "even if no substantial failure existed under the PSLRA, partial sanctions might still be

---

[10]     *See Gurary* v. *Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 220-21 (2d Cir. 2002):

> A securities complaint may, however, present frivolous claims joined with nonfrivolous claims in a wide variety of ways, including the combination of frivolous claims with [i] valid, winning claims; [ii] claims lost before a jury but which are meritorious enough to survive summary dismissal; [iii] claims that, though properly dismissed at summary judgment because capable of resolution as a matter of law, presented novel legal issues that could well have gone in the plaintiff's favor; and [iv] summarily dismissed claims that, while not legally frivolous, lack any merit.

assessable under ordinary Rule 11 standards to punish not the bringing of the whole suit, but only of the frivolous claim." *Id.*

## 2. Discussion

### a. The PSLRA Mandatory Review Provision Is Not Implicated

To the extent that the Echo Defendants are entitled to sanctions under Rule 11, it is only by operation of the PSLRA. Rule 11, by its terms, contains a safe harbor provision, which provides that a motion for sanctions "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). The Complaint was voluntarily dismissed on December 19, 2016, four days after the Echo Defendants' pre-motion letter for sanctions and twenty days after the Complaint was filed.

The PSLRA omits the safe harbor from its sanctions provision, but includes, perhaps in its stead, a requirement that the litigation proceed to a "final adjudication." That term is not defined in the statute, and the Court now considers whether Plaintiffs' entry of a voluntary dismissal without prejudice qualifies. After reviewing the sparse case law on this issue, the Court adopts the analysis articulated by Judge Cote in *Blaser* v. *Bessemer Tr. Co.*, No. 01 Civ. 11599 (DLC), 2002 WL 31359015, at *3 (S.D.N.Y. Oct. 21, 2002), and *Unite Here* v. *Cintas Corp.*, 500 F. Supp. 2d 332, 337 (S.D.N.Y. 2007); *accord In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *14 n.11 (S.D.N.Y. May 29, 2015). As Judge Cote observed,

The PSLRA does not define the term "final adjudication" and there is little case law on its meaning as it is used in Section 78u-4(c)(1). "In the absence of [a statutory] definition," a court "construe[s] a statutory term in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 127 L.Ed.2d 308 (1994). Black's Law Dictionary defines adjudication as "[t]he legal process of resolving a dispute; the process of judicially deciding a case." Black's Law Dictionary 42 (7th ed. 1999). The American Heritage Dictionary defines adjudicate as "[t]o hear and settle (a case) by judicial procedure." The American Heritage Dictionary of the English Language 21 (4th ed. 2000). *Cf. Sellan* v. *Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) ("When Congress uses a term of art such as 'adjudicated on the merits' [in 28 U.S.C.S. § 2254(d)], we presume that it speaks consistently with the commonly understood meaning of this term. 'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."). To the extent that plaintiff voluntarily dismissed her complaint without prejudice pursuant to Rule 41(a)(1)(i), this dispute has not been "resolv[ed]" and the Court has not "decid[ed]" the case. Nor has it "hear[d] and settle[d]" the case. By the plain meaning of the term, there has been no "adjudication" in this case, let alone adjudication that is "final."

*Blaser*, 2002 WL 31359015, at *3.

Other courts have adopted similar analyses, and this Court finds those analyses to be persuasive. *See, e.g.*, *Hilkene* v. *WD-40 Co.*, No. CIV A 04-2253-KHV, 2007 WL 470830, at *1 (D. Kan. Feb. 8, 2007) ("The PSLRA does not define 'final adjudication,' but the phrase ordinarily refers to a terminating decision, such as a verdict, summary judgment or dismissal with prejudice without leave to amend. ... Because the Court dismisses plaintiff's claims without prejudice and with the opportunity for plaintiff to re-file them in state

and/or federal court, the case did not result in a 'final adjudication.'"
(collecting cases)); *see also Great Dynasty Int'l Fin. Holdings Ltd.* v. *Haiting Li,*
No. C-13-1734 EMC, 2014 WL 3381416, at *4-5 (N.D. Cal. July 10, 2014)
(adopting *Blaser*) (quoting *DeMarco* v. *Depotech Corp.,* 131 F. Supp. 2d 1185,
1187 (S.D. Cal. 2001), *aff'd,* 32 F. App'x 260 (9th Cir. 2002) (non-precedential
memorandum order)); *cf. In re Cross Media Mktg. Corp. Sec. Litig.,* 314 F. Supp.
2d 256, 269 (S.D.N.Y. 2004) ("Because this case is dismissed without prejudice
and with leave to re-file, the Court may not have made a 'final adjudication'
and it may be unnecessary for the Court to rule on the applicability of Rule 11
sanctions at this time.").[11] *Contra Smith* v. *Smith,* 184 F.R.D. 420, 422 (S.D.
Fla. 1998).

The Echo Defendants' arguments to the contrary pay appropriate
attention to the underlying purposes of the PSLRA, but overlook the
significance of procedural context. What keeps Section 78u-4(c) from being a
strict liability standard is the inclusion of a final adjudication requirement.
However defined, that term means something other than a voluntary dismissal
of a complaint without prejudice a mere twenty days after its filing, even
coupled with a request for injunctive relief. And this case makes plain why
Judge Cote's reasoning is correct: Plaintiffs filed a ten-count complaint, of
which three involved claims of securities fraud, along with a request for

---

[11]     The Echo Defendants' citation to this decision is somewhat misleading. (Def. Br. 20).
While Judge Patterson in fact conducted a sanctions analysis, he did so only after
making the above-quoted statement that such analysis may be "unnecessary" in the
context of a dismissal with leave to re-file.

emergent relief; the Court granted the request, ordered expedited discovery, and then held a two-day hearing on the propriety of continuing the injunctive relief. The Court's decision to dissolve the injunction was, as the parties are well aware, based on the stringent standards for injunctive relief. (Tr. 383-84). These standards, as the parties are also well aware, require the Court to consider not the adequacy of a plaintiff's pleadings, but rather the *evidence* Plaintiffs presented in support of their requested relief. The Court found simply that that evidence was insufficient. (*See id.* at 388 ("Let me be clear. The fact I am finding ultimately the plaintiffs have not demonstrated likelihood of success on the merits sufficient to warrant the injunctive relief they seek is not tantamount to a ruling that their complaint lacks merit."); *id.* at 393 ("What I mean is I'm finding insufficient evidence from the plaintiffs of materiality and scienter.")). It was not asked, and did not opine, on the adequacy of Plaintiffs' pleadings.

### b. Plaintiffs' Complaint Was Not Objectively Unreasonable

Even if mandatory review were applicable, the Court does not find the "substantial violation" of Rule 11(b) that is a prerequisite for sanctions. In part, the Court's implementation of this standard is hampered by issues raised in the preceding section — in particular, the absence of any challenge to the adequacy of the Complaint before its voluntary dismissal. Only now do the Echo Defendants seek this analysis. (*See, e.g.*, Def. Br. 5-6, Def. Reply 1-3).

Plaintiffs' securities fraud claims were subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C.

§ 78u-4(b). *See, e.g.*, *ATSI*, 493 F.3d at 99. As this Court noted in a prior

opinion,

> [t]he PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)) (citing 15 U.S.C. § 78u-4(b)(1), (2)). To satisfy the scienter requirement, a complaint must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable[.]" *Tellabs*, 551 U.S. at 314. It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]" *Id.* at 323. A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

*Ong* v. *Chipotle Mexican Grill, Inc.*, No. 16 Civ. 141 (KPF), 2017 WL 933108, at

\*13 (S.D.N.Y. Mar. 8, 2017).

The Court's review of the Complaint — conducted only for purposes of

this motion and without meaningful response from Plaintiffs — suggests

deficiencies in pleading reliance and scienter. However, such a finding does

not mandate the issuance of sanctions. Rather, the Second Circuit has

recognized that sanctions under the PSLRA might not be appropriate where a

plaintiff, with leave to amend, would be able to assert a cognizable claim for

securities fraud:

> Because we do not believe that the PSLRA was designed to mandate sanctions in all cases for a complaint that, if properly pleaded, could state a cognizable claim under the securities laws, we examine [Plaintiff's] case to

determine whether an amendment could have stated such a claim.

Had [Plaintiff] been afforded the opportunity to amend his complaint to allege [the issuer's CEO's] misrepresentations with proper specificity, as he apparently sought to do, [Plaintiff] could have asserted a cognizable claim under Rule 10b-5 with respect to his second two purchases.

*Gurary* v. *Winehouse*, 235 F.3d 792, 801-02 (2d Cir. 2000) ("*Gurary II*").

On this record, the Court cannot find that Plaintiffs would have been unable to allege a securities fraud claim with the proper specificity. Here, too, the Court is careful to distinguish what Plaintiffs could adequately have pleaded in an amended complaint with what Plaintiffs were able to demonstrate with truncated discovery at the Hearing. With respect to the Licensing Agreement, Plaintiffs could have amended the complaint to allege its termination based on MTIA's failure to pay the balance due under the SPA. Similarly, with respect to the undisclosed principal argument, Plaintiffs could have amended the complaint to argue, as they did at the Hearing, "that [but for] these material omissions [regarding Platinum], Manchester would never have entered into the security agreement that defined the collateral relationship at issue in this litigation and pursuant to which Manchester's rights were subordinated to those of MTIA and Platinum." (Tr. 392).

The Echo Defendants allege additional violations of Rule 11(b) that go beyond pleading deficiencies. They claim, for example, that Plaintiffs and their counsel did not exercise appropriate diligence before filing the Complaint. (*See* Def. Br. 2-8, 12, 15; Def. Reply 1-3). However, the Court has considered the

account from Plaintiffs' counsel of the investigation that preceded the filing of the Complaint, and does not find a substantial violation in this regard. (*See* Whelan Sanctions Decl.; Pl. Opp. 2). Of note, Plaintiffs had interviewed Thomas Bishop, Echo's former VP of Operations and Product Development, who stated quite clearly in connection with the application for a TRO that "the Licensing Agreement is a mechanism by which Platinum Partners, the Goldberg Defendants and MTIA are attempting to transfer, for little to no cost to MTIA, Echo's intellectual property that was developed at a cost of over $100,000,000." (Bishop PI Decl. ¶ 37). Bishop also expressed concerns, which he claimed were shared by Echo's R&D team, that Platinum Partners — the affiliates of which were by then roiled with allegations of bribery and other misconduct — "may have controlled Echo." (*Id.* at ¶ 23). Bishop reiterated these concerns during his direct testimony (Tr. 9-48), and though cross-examination may have revealed certain deficiencies in Bishop's understanding of the relevant agreements, it did not cause him to recant his earlier testimony. (*See, e.g., id.* at 54 ("The decision not to provide the algorithms was made between myself and a discussion with Scott Hollander who was the CEO at the time who, we discussed and agreed that our interpretation, it was not included in the license agreement.")).

Further corroboration for the allegations in the Complaint was provided by Keith Krystyniak, Echo's former Director of Engineering. (Whalen Sanctions Decl. ¶ 6). Krystyniak confirmed Bishop's statements that (i) MTIA representatives had repeatedly insisted on obtaining Echo intellectual property

that went beyond the scope of the Licensing Agreement, and (ii) "everyone in Echo's Littleton, Massachusetts office believed that MTIA sought to misappropriate the CGM technology, and that Platinum was enabling MTIA's misappropriation." (*Id.*).

Plaintiffs' own representative shared similar views based on firsthand observations. James Besser related that after Plaintiffs had purchased the Notes, they learned "that Platinum directly controlled and still controls every aspect of Echo's business from financial decisions, appointing and terminating board members and executives, choice of business partners and vendors and even, whether Echo was permitted to pay its employees." (Besser PI Decl. ¶ 9; *see also id.* at ¶¶ 32, 64). Besser also recounted various discussions with Echo management regarding financing proposals, opining that the ones offered by Plaintiffs were demonstrably superior to those offered by MTIA, and that Echo's decision to go with the latter evidenced collusion on the part of MTIA and Platinum. (*See, e.g., id.* at ¶¶ 22-28, 33, 37-58). The Court agrees with the Echo Defendants that Besser should have read with greater care the relevant agreements. (Def. Br. 12-14). However, this deficiency does not negate Besser's account of his dealings with Echo, including: (i) a conversation with Shepard Goldberg in which the latter indicated that "he would shutter Echo and terminate all of Echo's employees" rather than accept Plaintiffs' offer (Besser PI Decl. ¶ 45); and (ii) Echo's entry into, and subsequent violation of, the standstill agreement with Plaintiffs in October and November 2016 (*id.* at ¶¶ 58-62).

In its discussion of materiality and scienter, the Court explained the difficulties Plaintiffs confronted as a consequence of the expedited discovery schedule:

> On [materiality], I don't really have a complete sense of what the meetings with Ms. Chen and Mr. Fuchs involved. The content, I have a very vague sense. I do not know about the existence or not of NDAs, non-disclos[ure] agreements. I do not have any indication of consequent actions by Mr. Fuchs or Ms. Chen, and I have difficulty on this record finding that this information is sufficiently material to support a securities fraud claim for which the appropriate relief is not damages, but reformation of the agreements.
>
> There is as well a more elemental problem. Even taking Mr. Besser at his word that he would not have invested with full knowledge of Platinum's involvement, to state an actionable claim, I need evidence demonstrating that Echo and its representatives acted with scienter. I don't have it on this record.

(Tr. 393-94).

This Court will not impose sanctions for Plaintiffs' supposed lack of diligence on so incomplete a record. As the Court observed, there are key witnesses from whom the Court did not hear at the Hearing, including representatives of Platinum Management and MTIA. Because of that, there remain a number of unanswered questions concerning (i) the interrelationship between and among various Platinum-related entities, Echo, and MTIA; (ii) the consequences, if any, of MTIA's failure to make the payments specified by the SPA; and (iii) the *bona fides* of MTIA's financing proposals. The Court declined Plaintiffs' request to draw an adverse inference from the absence of discovery from MTIA and Platinum (*see* Tr. 381-82); because this missing evidence would

also be probative of the issue of Plaintiffs' diligence, the Court declines for the same reasons to impose sanctions on Plaintiffs.

That leaves the portion of Rule 11(b) that proscribes submissions that are "being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). The Echo Defendants claim that Plaintiffs commenced this litigation for the improper purpose of forcing Echo to accept their financing proposal, citing as evidence: (i) the Court's observations during the Hearing regarding Plaintiffs' apparent "force-feed[ing]"; (ii) Plaintiffs' decision to issue a press release that struck the Court as overly definitive two days prior to the December 8 hearing; and (iii) Plaintiffs' representations to the Court in obtaining the TRO. (*See, e.g.*, Def. Br. 8, 12, 15, 16; Def. Reply 5-7).[12]

While Plaintiffs' conduct was at times more aggressive than the Court would have preferred, the Court cannot find that the Complaint was filed for an improper purpose. On the record presented to it, the Court concluded that "this dispute really does boil down to a very stark difference of opinion about the best way to keep Echo afloat and to get this concededly beneficial technology to market" (Tr. 385), and its rejection of Plaintiffs' arguments of irreparable harm stemmed, in part, from its belief that these arguments "rest[] on a misunderstanding of Echo's and MTIA's financing and licensing

---

[12] To the extent the latter claim involves materials other than the Complaint, such as the declarations supporting the TRO request or Plaintiffs' counsel's representations to the Court in connection with Plaintiffs' requests for emergent relief, such materials are perhaps better analyzed in the next section. *See* 15 U.S.C. § 78u-4(c)(1)-(2) (limiting review to "any complaint, responsive pleading, or dispositive motion").

obligations" (*id.* at 386). Plaintiffs' arguments did not carry the day, but neither did they strike the Court as vexatious.

The Echo Defendants argue otherwise, claiming first that the purpose of the lawsuit was "to 'starve out' the Company so that Plaintiffs could take over control and force the Company to accept their financing"; they further suggest that the Court held the same view. (Def. Br. 8-9 & n.12). In its evaluation of irreparable harm, the Court did observe that Plaintiffs were "content with a Pyrrhic victory, they're willing to starve Echo of funding presumably in the hope that Echo will turn to it for funding." (Tr. 387). However, that is a far cry from concluding that the lawsuit was brought for an improper purpose. After all, Plaintiffs believed — and had reason to believe — that Platinum Management was improperly directing Echo to transfer its valuable technology, for insufficient consideration, to MTIA.[13] Were that belief true, Plaintiffs would have been justified in seeking injunctive relief to prevent that transfer, even at the expense of depriving Echo of funding from MTIA. The fact remains that this Court will never know the degree to which Plaintiffs were correct.

The Echo Defendants also cite Plaintiffs' decision to issue a press release on December 6, 2016. (Def. Br. 9). The Court has already chastised Plaintiffs

---

[13] Among other things, and as previously noted, Plaintiffs had entered into a standstill agreement with Echo the preceding month, one provision of which was that "Echo would not raise any new money unless given 48 hours' notice to [James] Besser and his related entities." (Tr. 154). Echo violated that provision when it "entered into a half a million dollar bridge loan with an MTIA related entity and then informed us about it three days" later, on November 21, 2016, approximately one week before this lawsuit was filed. (*Id.* at 277-78; *see id.* at 154-55 (testimony of Schoenbart that Echo did not provide notice)).

34

for their decision to issue the release, which the Court found to be insufficiently precise in distinguishing the allegations of the Complaint from the Court's decision to grant the TRO. (Tr. 382-83). However, the Court does not consider the release to be evidence of bad faith. Particularly in light of the fact that it was issued one week after the TRO application was granted, the Court accepts Plaintiffs' explanation that it was issued to counterbalance, however inartfully, the Form 8-K issued by Echo concerning the lawsuit. (Pl. Opp. 8-9).

Hindsight being 20/20, the parties and the Court can identify things that Plaintiffs could have done better when bringing this lawsuit. But the standard here is one of "substantial violation," and the Court does not find that the conduct described in this section amounted to a substantial violation. At the risk of beating the proverbial dead horse, the Court observes that Plaintiffs' request for emergent relief failed because of a lack of evidence, and not because of the frivolity of the allegations in the Complaint. It will not impose sanctions under the PSLRA.

**B.** **The Court Will Not Impose Sanctions Under 28 U.S.C. § 1927 or Its Inherent Power**

**1.** **Applicable Law**

As a fallback position, the Echo Defendants request sanctions under 28 U.S.C. § 1927 or the Court's inherent power. Section 1927 provides in relevant part that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct." 28 U.S.C. § 1927. The imposition of sanctions under § 1927 is appropriate only "when there is a finding of conduct constituting or akin to bad faith." *Sakon* v. *Andreo*, 119 F.3d 109, 114 (2d Cir. 1997). Before reaching such a conclusion, a court "must find clear evidence that [i] the offending party's claims were entirely meritless and [ii] the party acted for improper purposes." *Revson* v. *Cinque & Cinque P.C.*, 221 F.3d 71, 79 (2d Cir. 2000).

Similarly, "[i]n order to impose sanctions pursuant to its inherent power, a district court must find that: [i] the challenged claim was without a colorable basis and [ii] the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Enmon* v. *Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (internal quotation marks omitted). "When a district court invokes its inherent power to impose attorney's fees or to punish behavior by an attorney in 'the actions that led to the lawsuit ... [or] conduct of the litigation,' which actions are taken on behalf of a client, the district court must make an explicit finding of bad faith." *United States* v. *Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000) (quoting *Hall* v. *Cole*, 412 U.S. 1, 15 (1973)).

The Second Circuit has "declined to uphold awards [of attorneys' fees] under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts." *Wilson* v. *Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012) (internal quotation marks and citations omitted); *see also*

*Milltex Indus. Corp.* v. *Jacquard Lace Co.*, 55 F.3d 34, 39-40 (2d Cir. 1995) (reversing sanction because attorney's actions in representing client were neither "entirely without color [of legal legitimacy]" nor undertaken with "improper purposes").

"[A]n award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power." *Oliveri* v. *Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986). "[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Enmon*, 675 F.3d at 144 (quoting *Oliveri*, 803 F.2d at 1273) (internal quotation marks omitted).

## 2. Discussion

The Court is no more willing to impose sanctions under either of these provisions. Plaintiffs' litigation failed in the short term — in part for reasons beyond their control — and it was promptly discontinued, but it was not indefensible, and it was not commenced for an improper purpose. The Court has addressed most of the Echo Defendants' sanctions arguments at pages 27 through 35 of this Opinion. It discusses here their contentions that Plaintiffs misled the Court to obtain the TRO. (*See* Def. Br. 10-12, 16-17).

The Court does not consider itself to have been misled. On the issue of the reasons for proceeding *ex parte*, the Court fully credits Plaintiffs' counsel's

explanation that Echo's eventual counsel had, at that time, disclaimed representation of the company on the matter. (Tr. 383). On the issue of the arguments for injunctive relief, the Court understands — and finds that Plaintiffs sincerely believed — in the arguments they made, even if they were unable to present evidence sufficient to continue the relief. While certain documents were admissible of multiple or contrary interpretations, Plaintiffs' discussions with percipient witnesses at Echo, plus James Besser's own interactions, gave them grounds to believe that something was amiss with their investments. The Court was concerned, and expressed concern, that counsel for Plaintiffs may have understated the hardship of injunctive relief to Echo. (*See* Tr. 397 ("I understood on November 29th that preserving the status quo would not harm the defendants, and what I've heard yesterday suggests or has caused me to change my views in that regard[.]")). However, the Court does not believe any understatement was deliberate, and it considered that fact in concluding that "the balance of hardships favors defendants" and promptly dissolving the injunction. (*Id.*). Finally, to the extent the Echo Defendants claim consequential damages, the Court cannot accept their arguments in full, and credits the evidence of alternate causes provided by Plaintiffs. (Whelan Sanctions Decl., Ex. E). In short, Plaintiffs had a good-faith basis, and proper motives, for bringing the instant lawsuit, and the Court will not impose sanctions on them or their counsel.

**CONCLUSION**

For the reasons stated in this Opinion, the Echo Defendants' motion for sanctions is DENIED. The Clerk of Court is directed to terminate the motion pending at docket entry 56.

SO ORDERED.

Dated:     March 14, 2018
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge